Michael Avenetti on behalf of the appellants, good morning. May it please the court. Class certification in this case was denied nearly three years ago in June of 2013. That was approximately six months prior to this court's seminal decision in the Enray Deepwater Horizon case, a case that has occupied many days and nights of this court. Since that time, three years ago, seven out of 277 individual named plaintiffs have had their day in court. Seven out of 277. 270 breach of contract claims remain. That is the practical reality of what has transpired as a result of the district court's denial of class certification. You could have sought interlocutory appeal, couldn't you? We could have done so, Your Honor. You're absolutely right. We could have done so and we chose not to. We decided to proceed with the seven claims of the seven individual plaintiffs because that is what they wanted. They wanted their day in court and they wanted their claims resolved at trial and we had to respect that decision on behalf of those seven individuals. At this rate, these breach of contract causes of action will be resolved in some 40 years. The district . . . Well, then what you're saying is your clients are not adequate representatives or perhaps not typical if they wanted to go to trial and hang the rest of the class in the balance pending their right to go to trial. Well, Your Honor, I would respectfully disagree. The clients at that stage knew that they had two options, A, to take an interlocutory appeal or B, to proceed to trial without any prejudice at that point to either their ability to argue for class cert. Otherwise, there would be a mechanism in place that would mandate that a denial of class certification would require an immediate appeal and that's not the standard. They had an option and they chose to proceed to trial. The district court erred in failing to grant class certification on the displaced, relocated and obstructed view claims. Each of those claims had common issues that predominated and I'm going to focus today on but one of many. First, for the displaced class, did the NFL breach its contract by failing to provide the seat as promised on the ticket? The tickets, of course, were uniform for each and every fan that attended the Super Bowl with the only exception being a different seat number. That was a common question that predominated the displaced class. The relocated class, same question predominated. Did the NFL breach its contract by failing to provide the seat as promised on the ticket? For the obstructed view class, did the NFL breach its contract by failing to provide an unobstructed view of A, the field and B, the video board in the air above the field, namely for punts, field goals, etc.? As this court concluded in Deepwater in a very thorough analysis, quote, the phased trial of common issues in this case would undoubtedly prevent the repetitious re-litigation of these common issues by each individual claimant. And in fact, in Deepwater, on page 811 of that detailed opinion, this court discussed the principle requirement of the Supreme Court's decision in Walmart and described it as follows. The principle requirement of Walmart is merely a single common contention that enables the class action, quote, to generate common answers apt to drive the resolution of the litigation. These common answers may indeed relate to the injurious effects experienced by the class members, but they may also relate to the defendant's injurious conduct. And then they quote, even a single common question will do. And in this instance, we had the seminal question as to whether the National Football League breached its contract with the fans as it related to the displaced, relocated, and obstructed view classes. And yet, despite that fact, we are now left to litigate 277 at a minimum breach of contract claims on behalf of these fans as well as countless others, because- May I ask you what happened? Are you involved in the Greco v. Jones case? I am. What's happened to that one? That case has presently stayed, and it's in the throngs of discovery. And what's the difference between that case and this case? That case will involve probably no fewer than 40 different trials. My point is, it's too, I mean, all I know is that it says it's 273 ticket holders in a separate case, and I just wondered, so you've got, you're representing another group of plaintiffs in that case, is that right? Yes, Your Honor. Here, here is the- Were they displaced, obstructed, or relocated? All of the above. Okay. Why? Just, from- So, so here, here is what transpired. Once Class Cert was denied, we had these individual plaintiffs who had retained us separate and apart from this case. We had to take a belt and suspenders approach and file on their behalf so as to protect their rights as this case worked its way through the system. That's why that case was filed, Your Honor. Okay, so you, okay. So we took a belt and suspenders approach. There are plaintiffs within that case that are obstructed, relocated, as well as displaced. Okay. And then who is in the Third Circuit case? We have no connection with the Third Circuit case. That was one or two, I believe, plaintiffs that filed on their own in connection with- That's not a class action? I don't believe it is, no. Okay. The District Court erred in failing to grant Class Certification in this case. There were numerous common issues that could have been resolved and instead we're left now with this quagmire where we have to go and litigate each of these cases, each of the breach of contract causes of action, et cetera. Any suggestion to this panel that the National Football League has conceded liability on breach of contract is completely erroneous and the panel should ask for a record citation as to where that- Well, their brief says they did it, so it seems to me if it, if they hadn't conceded it before this appeal, they've conceded it now. Well, Your Honor, they certainly- On the matter, on the matter of the displaced holders. I don't think they conceded on the other, but the other two, but- Well, Your Honor, they actually speak out of both sides of their mouth because I litigated the trial in Dallas across two weeks and I can assure you that there was not a concession on breach of contract and the panel need not look any further than the verdict form to confirm that in fact the breach of contract question was on the verdict form. And Judge Lynn would not have allowed that question on the verdict form had it been conceded. They did not concede breach of contract. They've never conceded breach of contract. And nowhere in the record can they point to the fact where they conceded breach of contract. And regardless, even if they have conceded breach of contract, as we cite in our brief, that doesn't remove the question from the Rule 23 analysis. In fact, that would militate in favor of class certification, not against it. Well, to the contrary, we don't normally certify classes just for the purpose of damages. What advantage is gained? The advantage that would be gained, Your Honor, would be that the breach of contract question would be resolved with- Well, let's assume arguendo that they, just for purposes, I mean, I don't want to interrupt the rest of your argument, but so, you know, if you prefer to make your argument, make your argument. But- In my experience, I prefer to answer questions from- All right. Assume arguendo that they have now, in fact, essentially conceded in their brief, whether or not before, maybe it's in light of the jury verdict, that they breached contract with the displaced holders. And the only issue remaining then is the extent of the damages, and that depends on the seat that each person originally was assigned, and the seat that they got at the football game. And my understanding is that those people were reassigned to 60 different blocks of seats throughout the stadium, so some of them may actually have come out better. There's three groups, Your Honor. There's the displaced class, and the relocated class. I'm asking- Okay. All right. So the displaced class never received a seat anywhere. Right. Okay. And that is arguendo, the group for which the NFL has, under your example, conceded relating to breach of contract. All right. And they've- Okay. All right. Not the relocated. I'm sorry. But, Your Honor, I don't believe that what you can do is argue against class certification of the district court, proceed to a trial, and then wait until you're up on appeal and all of a sudden concede in your brief, we concede breach of contract, and then that rule 23 analysis. The rule 23 analysis that is now conducted by this panel needs to be the same analysis that occurred at the time the district court rejected class certification. And so, in any event, the breach of contract, among other things, fraudulent inducement and others, was a common question that predominated. It's in every one of the cases on a go-forward basis. Well, what do you do, just for the sake of argument again, your argument on the obstructed view is that, you know, that they . . . that all of these 1,300 or whatever it was people got an obstructed view, either of the field or of the video screen. And one of the sub-issues there is which one it was. What were they obstructed from seeing? And the district court ruled against your plaintiff's trial on an obstructed view claim. The district court allowed the fraudulent inducement and breach of contract relating to the obstructed view of the playing field to go to the jury. For those particular plaintiffs. And they lost.  No. They prevailed on breach of contract. The NFL argued there was no obstructed view. We presented evidence that showed there was obstructed view. We lost on the fraudulent inducement cause of action. We won on breach of contract relating to the obstructed view. In addition to class certification, the erroneous class certification determination, the district court also erred considerably in dismissing the Cowboys defendants at the Rule 12b-6 motion to dismiss stage. The district court ignored the allegations in the complaint, the well-pled allegations in the complaint, did not give the benefit of the plaintiffs . . . those . . . the benefit of those allegations, did not take those allegations as true, and basically sat as judge and jury and rendered a decision on the allegations at that stage. This was patently improper. That is not the standard at the 12b-6 stage. The district court did not convert it to a motion for summary judgment and ruled at the 12b-6 stage that the Cowboy defendants were out of the case, that none of the causes of action could continue to exist against the Cowboys defendants. Because she found that they were not agents of the NFL and that the ticket arrangement, the contractors were the NFL. I don't believe that she found that they were not agents of the NFL. I believe that she made a determination that the contract was . . . that they were not a party to the contract. But if you look at the contract, which is the ticket, the ticket does not denote who the contracting parties are. It does not state this is an agreement between the National Football League and the . . . But who gets the money? The NFL and the Cowboys get a kickback, right? Well, that was unclear. In fact, there was an invoice . . . Judge Lynn didn't seem to think so. Well, I respectfully disagree. This is a 12b-6 motion. It is not a motion for summary judgment, and the case law is replete with teachings that require . . . it's not optional . . . require that the allegations in the complaint be taken as true. And, in fact, we allege at paragraphs 4.13 and 6.2 of the operative complaint that the Cowboy defendants were parties to the ticket contract, Your Honor, and we also allege . . . Well, that's true. All the NFL owners are a party to the contract. I mean, I'm not sure why you're getting in the weeds on this one. I mean, it's the Super Bowl. It's not the Dallas Cowboys game, you know. I mean, just as a spectator, it's the NFL's game. All the owners share in the revenues, they share in all the bounty, and share in everything else. It's in the AT&T Stadium, but it's the NFL putting it on. I mean, it's just . . . I get your point, but, you know, with limited minutes, I'm just kind of not sure.  Well, I appreciate the heads up. I mean, it's the Super Bowl as opposed to a Dallas Cowboys game. You know, if you put the game, then they're going to get some money, but all . . . whatever it is, 32 owners share from the proceeds, so . . . Yeah. But the host city, Your Honor, gets additional benefits . . . I get that, but you were into the contract and the ticket. That's where your argument was centered, saying, I mean, the back of the ticket doesn't have all 32 owners in it, but at any event, I mean, I think we understand your 12B-6 standard and what you're saying the trial court, you know, didn't do and all that. And we detailed, on pages 27 through 30 of our reply, we detail all of the allegations and the complaint relating to the Cowboys defendants that were in that complaint at the 12B-6 stage. And the court's dismissal of the claims against the Cowboys defendants at that stage ignored the teachings of Ashcroft and the Twombly decision. Well, now, wait. She did have the ticket. She quoted the ticket, didn't she, in her opinion? Yes, she quoted the ticket, but . . . So that . . . so she could take judicial notice of what the ticket said.  The ticket did not end the inquiry. The ticket actually added to the inquiry in our estimation. Let me . . . Judge Lynn did say something about obstructed view, because she said the ticket said it was to be a spectator to the game. And she said that meant the game. It didn't mean the video screen, right? She said that that meant the activities on the field, and we disagree with that. We believe the contract . . . Okay, fine. So that's what I meant about obstructed view. We believe that the game is not just within the four corners . . . I know what you believe. I was just trying to show you that I read this a couple weeks ago, and I misremembered part of it, but not all of it. The term spectator to the game, as set forth in the ticket contract, was at a minimum ambiguous. If you tell someone . . . I understand. I understand. I'm not asking you a question, and your time is up. I was transitioning to this argument, actually. I thought it was a good segue. Well, you've got a red light, and since you've stopped, I'm going to stop you, as opposed to letting you finish a sentence that you haven't started. But you've reserved some time for rebuttal, and covered and played the opening, so you'll have some time to come back up. Thank you. All right. Thank you, sir. All right. Let's hear from Mr. Behrens. Good morning. May it please the Court. I wanted to address off the bat some questions that Judge Jones asked of Mr. Avenatti, because there is some confusion here. Indeed, it is significant that the plaintiffs chose not to make a Rule 23-F interlocutory appeal, and that is because there was no abuse of discretion in the district court's denial of class certification. It is not true that the Greco case was started after class certification was denied. That was filed before class certification was considered, and was already in play at that time. Since the district court denied class certification, not only did this case proceed all the way to trial, but the Greco case, the companion case of 237 plaintiffs, represented by the same plaintiffs' counsel, has proceeded through discovery and a bellwether plan. So that is the sequence that we're dealing with here. Now, counsel referenced the Deepwater Horizon case . . . But just before you go to that, and I didn't really want to go to it, but just so I'm clear, I mean, he's sort of given us the parade of horribles in terms of where all these cases are hanging. So just kind of in a nutshell, I mean, you'd agree with counsel Opposite's recitation of the status of the remaining cases? The status of the Greco case is that it proceeded through discovery, it was up to the summary judgment phase, and then on counsel's motion was stayed pending the resolution of this appeal. The separate Pollack case, in which counsel's not involved, that's a case that happened in Pittsburgh and went up through the Third Circuit, that is over as far as the federal court standpoint, and now there's a separate state court case in Pittsburgh. So that's the status of those cases. There was a reference made during plaintiff's argument to commonality and the need to only have a single common issue. And the reference was made to the Walmart v. Dukes case. That is a confusion of which common issue we're talking about. Walmart involved Rule 23A1 commonality, which is where you only have to have one common issue. The basis for the district court's denial of class certification here was that common issues did not predominate over individualized issues. And the district court did exactly what the Supreme Court's precedent and this court's precedent commands her to do in finding that common issues did not predominate over individualized issues of particular class members, and the class mechanism was not the superior method of resolving the controversy. She considered how the case would be tried. For the displaced class, there was reference made to whether liability was conceded. From the beginning of the case, there was never any dispute that every ticket holder in that displaced group was entitled to a seat and did not receive one. The only legal issue that could have been a liability or damages issue that was in dispute was whether the NFL's immediate provision of a refund meant that it had not violated the ticket terms. That was a legal issue that was decided by the district court in advance of trial, as the district court predicted in her class certification decision. It would occupy exactly zero time at trial. The only issue that was presented at trial, and as she correctly forecasted, were the individualized damages of particular class members, and the damages that the displaced plaintiffs were claiming varied widely. They sought different categories of damages. For example, some sought souvenirs, some sought lost pay, some sought reimbursement for parties days before the game, some sought reimbursement for gifts that they purchased for friends while at the Super Bowl, others didn't. There was also wide disparity in what the level of proof they had available. Some ticket holders, like two of the ticket holders who went to trial as displaced plaintiffs, did not have a single receipt to substantiate their costs. So their only basis for showing that they had damages was their testimony. Well, besides that, she denied class certification on numerosity. That's correct. And that's because the NFL made reimbursement offers immediately after the game, and all but 40 of these displaced ticket holders accepted those offers. So the number of class members in the displaced class was at most 40, and that would assume that particular ticket holders didn't hold multiple tickets, like Mr. Ivey did, where he had two tickets, which would have reduced it even further. But the plaintiff's argument on appeal is that once the number was 40, that the district court was required to find numerosity. And that is directly contrary to this court's precedent, including the Mullen case that they cite for that proposition. This court has repeatedly admonished district courts that in evaluating numerosity, it should not focus on numbers alone, but should look at whether joinder is impracticable. And there was no evidence. You can look at the briefs, the plaintiff's briefs on class certification. They cited no evidence that joinder was impracticable, and it was not an abuse of discretion, given that record, for the district court to find that they had not established numerosity. And in fact, the record that was before the district court was that plaintiffs had already joined 237 ticket holders in a mass action alleging the same claims. So that was an independent ground and a correct basis to deny class certification on a displaced class. For the relocated class and the obstructed view class, now the relocated class are the people Judge Jones you referenced who didn't get their original seat but were relocated to other seats. For that class, there were individualized issues that went well beyond damage. For that class, it was 864 ticket holders. They were relocated to 60 different sections within the stadium, many of which were equivalent value or greater value seats, and there was no record of who had the original seat or what replacement seat any ticket holder received. And also, those plaintiffs claimed that they were delayed in gaining access to their seats and that was a separate breach of the contract. And so in order to determine whether there was liability or damages or even ascertainability of the class, the court would have to do an individualized inquiry as to which seat the plaintiff occupied, what replacement seat they received, whether there was a difference in face value between the original seat and the replacement seat, and if there was no difference in value, whether there was some other basis to claim that it was an inferior seat. Now, you say some of the 60 got, I guess, better seats or I guess it's to say the seats they got were not obstructed, is that what you're talking about? Relocated plaintiffs, that's totally separate from the obstructed view class. That's not quite what I'm saying, but I mean, it could be relocated, something that's not as bad as relocated, I'm saying it's implicit in the relocation, those persons had an unobstructed view. Yes. I mean, I think that was the record. I don't think there's any allegation that any of them received an obstructed view with their replacement seat. So whether it was better or not is relative in the sense of, for example, if what they thought they were getting, you know, they were going to be closer to the yard line versus, you know, they get obstructed or relocated, but they're, you know, in the bird's nest, so to speak. Right. And the point there is that there's differences for every ticket holder as to where they originally were and where they ended up. And plaintiffs have said in their brief that you can infer because the relocated seats were all originally in the 200 level, that if they got moved to the 300 level, for example, that you can state unequivocally that that was definitely an inferior seat. Well, these seats were situated right on the goal lines. And so if you were moved from the 200 level, the goal line, to the 50 yard line, row one of the 300 level, is that an inferior seat or not? And the point is that it would be for the jury to determine. Yeah, because you got to look now up at the, you got to look up at the board. Now, you're forced to look at the game on the field, you know, and being prestigious. But you see that there's, there's differences and they would apply to every single ticket holder. And then on top of whether the seat they received was inferior, they also claim delay. So you would have to look for each ticket holder, were you delayed, for how long, and if you were delayed, did you miss anything? Any part of the game or not? That would be different ticket holder to ticket holder. And in addition to that, everybody's damages would be different and there's no way, no formula that you can look at to determine what the damage is. Well, let me ask you this, and this may not be totally germane, and I'm not sure the more you're breaking this down whether this would even be practical, but I do know, you know, there are cases here where let's say the class was certified, but you have these differentiations, but there's enough commonality on the proof, i.e. breach of contract, that kind of stuff. And then the judge impanels umpteen juries in terms of deciding these striated claims, so to speak. Maybe this is too much to have it 50 or 60, but just from a mechanical standpoint, I know that this judge in particular with many of these complex litigation cases, etc., etc., you know, you try what the common areas are, but impound, you know, these multiple juries that basically decide the nuanced parts as to claim them. Maybe you describe something that's beyond that every time you say, you know, there's all these little tickers, but I'm just asking kind of as a process issue. That wasn't a possibility here? Well, there were . . . there are management tools available under Rule 23C, and the district court specifically considered whether those management tools should be implemented. But the point here, though, is that it's an abusive discretion standard. There is no case that tells the court that they have to adopt these management tools. And in fact, if the court does not find the common issues predominate over individualized issues, the court is prohibited from manufacturing predominance through the use of management tools like the kind that you're describing. That's the Castano case. That's exactly what they tried to do. They said, we'll just parse out the individualized issues and put them over here and not consider them in the predominance inquiry, and the Fifth Circuit said that is impermissible. But the other point is on relocated holders, there aren't common issues because liability itself is dependent on where the first seat was and where the second seat was. Your Honor, I agree with that. Now, the plaintiffs have proffered a different liability issue, which would be if you didn't provide the exact seat, that it's a per se breach of the contract. But if you were moved right next to yourself or to the 50-yard line, even if you could say that it's a per se breach, there would still be an individualized issue of whether you were damaged. These are governed by the UCC, right? That issue didn't come up, but I guess they would because it's a contract issue. I'm assuming that they were applying Texas law. I could be wrong? Yes. Texas law. That's correct. I don't see how you could have per se, but anyway. Right. I think that that's true, but for class certification purposes, there was no dispute that the people didn't get their original seat because that would occupy exactly no time. Right. The application was never contested. Right. All the issues I described is what would be contested and what is contested. Right. For the obstructive view, it's even worse because there you had 4,700 ticket holders in the proposed class. They were in 44 different sections of the stadium claiming different obstructions and Judge Jones, as you mentioned, some claim obstructed view of the field, some claim obstructed view of the video board. And the threshold issue of whether any of those seats actually had an obstructed view is a highly individualized question. And the evidence in the class certification records show that the views differed greatly from seat to seat. And all this court needs to do to confirm that is to look at the picture that Mr. Fortune presented at trial, which was of his view, where you couldn't see nearly any of the field if that picture is to be believed and it was accepted by the jury. With the photos at page 29 of our brief, which are other examples of proposed class members, which all show a clear view of the entire field. There was also an uncontroverted affidavit of a proposed class member who affirmatively stated he had a clear view of the entire field and the video board and he was within the proposed class. But the point for class certification is that inquiry of whether there was an obstructed view was an individualized question. In sum, the district court did not abuse its discretion. This is a highly deferential standard. Our courts rarely overturn a denial of class certification for just that reason. The district court did precisely the analysis. Am I right? Just to clarify what I'm trying, what I think I'm remembering, didn't the court hold that an obstructed view of the video screen, although I understand it's a unique feature of that video screen, was not a breach of contract? She did. Okay. Now that was on summary judgment. Summary judgment. They challenged all these pretrial rulings and so they get muddled together. At the class certification stage, she had not yet made that ruling. And so that individualized question was still an issue. When we got to the summary judgment stage, their claim for breach of contract was that there was a contractual obligation to provide a view of the center hung video screen at There was no dispute that the Super Bowl 45 ticket says nothing about the video board. Nothing whatsoever. Well, I take it these were the named plaintiffs who went to trial or were they just? It's actually a subset of the named plaintiffs. I think if you go back to the beginning of the case, there were 11 plaintiffs, four dropped, including one that dropped on the eve of trial. And seven of what was originally eight proposed class representatives actually went to trial. Well, if the, what impact does it have that the judge said, you know, even if we felt there was an abuse of discretion, wouldn't her ruling about the obstructed view on summary judgment, if that's up for review, right? Or not up for review? I mean, wouldn't that have an impact, at the very least, reduce the size of that class? Well, it would, but I mean, there, I mean, take the people that went to trial. They claimed that they had an obstructed view of both the video board and the field. So I don't think it would have reduced the class substantially. Most of those 4,700, their claim was that they had an obstructed view of the field. So I don't think that it would have reduced the class. How do we know that? Well, I mean, we know that, I guess we only know that if you, by looking at what happened in the Greco case and extrapolating from that. Okay. I think that that would be the way I could answer that. But to answer, oh, I see that I'm out of time. Go ahead and finish your, you got it. Well, on the video board question, I just wanted to state that there was no dispute that the ticket said nothing about the video board. The whole claim is based on the notion that the word game on the ticket is ambiguous. There's no credible argument to be made that the game at the Super Bowl is the game being played on the field. It doesn't mean video board. But for all those reasons, we ask that the district court's ruling be affirmed in all respects. All right. Thank you, sir. Mr. Pornia. Good morning, Your Honors, and may it please the Court. In my brief time before the Court, I'll explain why the trial court correctly ruled that the game was a contract between the NFL and the plaintiffs. Now, Chief Judge Stewart, you pointed out that this is the Super Bowl. Everybody knows that this is a game put on by the NFL. But giving plaintiffs the benefit of the doubt, any question they might have had about who the contracting party was is resolved by the language of the ticket. It is expressly stated in there who the contractual provisions include, and it is repeatedly the NFL. There is not one provision on that ticket that names the Dallas Cowboys as a party to the contract. So the ticket speaks for itself. But what we're hearing now is that the ticket may be ambiguous. Maybe implicitly the Cowboys are named in it. However, this argument is being brought before this Court for the first time on appeal, and we ask this Court to strike it because it is waived. We've also heard that there's an issue with what the Cowboys did that might make them parties to this contract. Now, the counsel explained that on pages 26 through 30 of the reply brief, they set forth several factual allegations that they claim prove that the Cowboys were a party to this contract. Getting to the merits of those in just a second, what I'd like to point out first is that this is being brought to this Court for the first time in a reply brief. If the Court will refer to record pages 1050 and 1051, that's where plaintiffs alleged in the trial court the factual bases for the Cowboys' involvement in the contract. And those factual bases were repeated in plaintiffs' original brief before this Court on pages 40 and 41. And those facts were that the Cowboys sold tickets, that the Cowboys received 5% of the tickets to sell, that the Cowboys sent an invoice to some unknown person because that person sent tickets via FedEx, and that the Cowboys processed payments by credit cards. Every single one of those factual allegations that was before the trial court and that was before this Court in the opening brief of the plaintiffs speaks only to the Cowboys' role as a third-party vendor of tickets. It does not speak to the Cowboys' role as a contracting party. And finally, there's this agency principle. And once again, this is an issue that's being brought before this Court for the first time on appeal. And to the extent this Court is willing to entertain it, it is unmeritorious on its face. There is no factual basis. There's no factual allegation even that the Cowboys were the NFL's agent or vice versa as is being claimed on appeal. But to the extent this Court is willing to entertain it, as the case cited by plaintiffs clearly states, it is an undisclosed principle for whom the agent can be held liable. But nobody in this entire case has been undisclosed. The NFL name is repeated over 12 times on the ticket. So, for these reasons, Your Honor, we ask that this Court affirm the 12 v. 6 ruling by the trial court. Thank you very much. Thank you, sir. The entirety of the district court's decision dismissing the Cowboys' defendants is at issue in this appeal. The entirety of that decision. Every count against the Cowboys' defendants is not contingent on them being a party to the contract. All right. Well, I'm looking at your reply brief. So, what's your response quickly to his argument that much of this you raised for the first time in the reply brief? We disagree in its entirety, Your Honor. And the reason is that we placed the complaint at issue, the operative complaint. And in our opening brief, we stated that the district court's dismissal of all of the counts against the Cowboys was an error at the 12 v. 6 stage. What does that include? It includes a count for negligent misrepresentation and fraudulent concealment. That's separate apart from any contract claims. The complaint has to be read on its face and the plaintiffs have to be given the benefit of the doubt at the 12 v. 6 stage. So even if these agency arguments were raised late and we don't believe that they were, even if they were, we absolutely raised the dismissal of the negligent misrep and the fraudulent concealment claims at the 12 v. 6 stage. That isn't just being raised for the first time on reply. Judge Jones, you asked if the decision on summary judgment relating to the obstructive view has far-reaching effects or something to that effect, would have an effect. Absolutely, undoubtedly it does. And in fact, I take exception to counsel's statement that the remaining 4,700 claims largely involved obstructive views to the playing field. They largely involved obstructive views to the video board. So that in and of itself shows why there's a common question that predominated. Depending on what this court does relating to the affirmation or rejection of that decision on summary judgment, and we don't believe it can be affirmed, that potentially has very far-reaching effects to the balance of those 4,700 individuals. And I do want to touch on . . . But she did hold that the only breach of contract for obstructive view was that of the field. Correct, and we disagree with that. And the reason why we disagree with that, and this court need not look any further than the testimony of Roger Goodell himself, which is in the record. Mr. Goodell was asked under oath as to what an obstructive view is. And Mr. Goodell stated unequivocally that it was an obstructive view of the stadium, not of the field. This is the CEO of the National Football League. This is a man who had 25 years of experience in the league. He has the ability to bind the National Football League as to its position. He was asked by me, under oath, unequivocally, what's an obstructive view? And he stated it's of the stadium, not the field. On that basis alone, summary judgment was inappropriate. The relocated class. I want to be really clear about something. No one was moved to the 50-yard line. This is a fallacy. It's an absolute fallacy. Does the panel really believe that there were 50-yard line seats available in the morning of the Super Bowl to give to fans who were relocated? The case is not going to turn on that count. I understand that. But that's just simply not accurate. And the fact of the matter is it's important for the panel to know how the league went about determining whether views were obstructed or not. The seats weren't in at the time the tickets were printed. So the way the league went about that is the same way in which the plaintiffs suggested and proposed would be handled relating to class certification, namely through sightline drawings and analyses. That's how the league did it when they printed the tickets. That's how the league did it when they determined whether there were obstructions. May I? Could you just clarify for me what did your plaintiffs get by going to trial that other people didn't get by settling on the relocated ticket issue? Well, first of all, we don't believe the settlement offers are of any relevance. But to answer Your Honor's question, the fact of the matter is that the settlement offers had a number of conditions tied to them and, in fact, curtailed what the plaintiffs could potentially get. There were caveats put in place. Well, of course there are. There are always going to be caveats in a settlement. But they included tickets to future Super Bowls and things like that. So I just wondered. And they were largely made after we filed the lawsuit. They were largely made after we filed the lawsuit. But more importantly, you had to have an actual receipt for an expense as opposed to just being able to attest that you had expended an expense. But your clients at trial were just able to testify that they spent so much for soda pop or whatever. Yes. But to put this in context, we're talking thousands of dollars. Our clients were not some fat cats that got these tickets from some corporation. We're talking about people that, in some cases, took out a mortgage out of their house to go to this once-in-a-lifetime event. Now, that may seem very strange to us. Sounds like a jury argument to me. But in any event, Your Honor, we're talking about significant money that was spent in connection with this game. And what you can't do is learn information that shows that you're not going to be able to fulfill your obligation and sit on your hands and not tell anybody about it and just hope that it all works out. And that's exactly what transpired in connection with this case. All right. I think we got your argument. Like you said, if you make it there, you've got a jury argument. But I'm not going to say going to the Super Bowl is right up there with, you know. Anyway, I'll keep that part. You're really making this a dramatic event on this case. We get your point. I mean, we're here on the class action. It's steeped in the context of AT&T Stadium. And, you know, we get it. But we'll take a close look. We've read a lot of this already. But the rest of it, we'll look even closer at the matters. And I think we pretty much understand everybody's position in the case. So rest assured that, you know, we'll take a hard look and we'll rule on it. I appreciate the panel's kindness. All right.  Counsel, we're good. Thank you.